Submitted on the record and brief June 7, accused suspended for nine months from the practice of law July 20, 1995

## In re Complaint as to the Conduct of

## E. JEFF JEFFERY,
### *Accused.*

(OSB 92-156, 93-90, 94-27; SC S42185)
898 P2d 752

Mary A. Cooper, Assistant Disciplinary Counsel, Lake Oswego, filed the brief for the Oregon State Bar.

E. Jeff Jeffery, Coquille, waived appearance.

PER CURIAM

## PER CURIAM

This is a lawyer disciplinary proceeding. The Oregon State Bar (Bar) charges that the accused violated DR 5-105(E)[1] by simultaneously representing two codefendants in a criminal case, whose interests were in actual or likely conflict; DR 5-101(A)[2] by continuing to represent a criminal defendant after it was alleged that the accused himself had participated in the same drug transaction as the client; DR 7-104(A)(2)[3] by providing legal advice to an unrepresented person whose interests were adverse to those of his client; and DR 1-102(A)(4)[4] by threatening to refuse to put on a defense for a client in a criminal case, for the purpose of creating reversible error on appeal or through post-conviction relief.

---

[1] DR 5-105(E) states:

"Except as provided in DR 5-105(F), a lawyer shall not represent multiple current clients in any matters when such representation would result in an actual or likely conflict."

DR 5-105(F) provides:

"A lawyer may represent multiple current clients in instances otherwise prohibited by DR 5-105(E) when such representation would not result in an actual conflict and when each client consents to the multiple representation after full disclosure."

DR 10-101(B)(1) defines "full disclosure" as "an explanation sufficient to apprise the recipient of the potential adverse impact on the recipient, of the matter to which the recipient is asked to consent." Additionally, under DR 10-101(B)(2), "full disclosure" for the purpose of DR 5-105 includes "a recommendation that the recipient seek independent legal advice to determine if consent should be given and shall be contemporaneously confirmed in writing."

[2] DR 5-101(A) provides in part:

"Except with the consent of the lawyer's client after full disclosure, a lawyer shall not accept or continue employment if the exercise of the lawyer's professional judgment on behalf of the lawyer's client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests."

[3] DR 7-104(A)(2) provides:

"(A)    During the course of the lawyer's representation of a client, a lawyer shall not:

"* * * * *

"(2)    Give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interests of the lawyer's client."

[4] DR 1-102(A)(4) provides that "[i]t is professional misconduct for a lawyer to * * * [e]ngage in conduct that is prejudicial to the administration of justice."

A trial panel of the Disciplinary Board found the accused guilty of the foregoing charges.[5] The panel suspended the accused for a period of six months, with four months of that total suspended on two conditions: that the accused obtain six hours of ethics-related credit under the Bar's program of continuing legal education and that he pass the professional responsibility portion of the bar examination.

Review by this court is automatic under BR 10.1, because the length of the suspension is in excess of 60 days. This court reviews the record *de novo*. ORS 9.536(3). The Bar has the burden of proving misconduct by clear and convincing evidence. BR 5.2. We find the accused guilty of all four charges listed above and suspend him from the practice of law for nine months.

## FINDINGS OF FACT

A. *First Cause of Complaint — Dual Representation of Sharpe and Scheirman.*

On October 4, 1991, Sharpe was indicted. The indictment charged that, in August 1991, Sharpe had conspired with Ward and Scheirman to deliver methamphetamine. Scheirman was indicted on the same charges. Shortly thereafter, Sharpe and Scheirman hired the accused to represent them.

Several times between October 1991 and February 1992, the district attorney and the circuit court judge discussed, in court while the accused was present, the possibility that the accused had a conflict of interest. The accused disagreed and did not withdraw from either representation. The district attorney moved to disqualify the accused from representing Scheirman, but the motion was denied.

At some point between October 1991 and February 1992, the district attorney conveyed to the accused a plea offer intended for Scheirman. Unrelated drug charges were pending against Scheirman, and the district attorney said that Scheirman would be offered favorable terms in that matter if he provided information concerning Sharpe's role in

---

[5] The trial panel found the accused not guilty of a second violation of DR 5-105(E). Neither party disagrees with that finding of not guilty, and we do not consider it further.

the August 1991 drug transaction. The accused never conveyed that offer to Scheirman, who later was convicted in the unrelated case.

On February 21, 1992, the district attorney dismissed the indictments against both Sharpe and Scheirman, relating to the August 1991 drug transaction. Sharpe was reindicted in March 1992. Scheirman never was reindicted. The accused continued to represent Sharpe.

On February 24, 1992, Sharpe and Scheirman signed a document stating that they waived any actual or implied conflict regarding the accused's dual representation of them. The document described warnings that the accused had given them about the dangers of dual representation and strategies to avoid an actual conflict.

B.  *Second Cause of Complaint — Representation of Sharpe During Investigation of Accused.*

Ward, a police informant, asserted that the accused had been present at and had participated in the August 1991 drug transaction, along with Sharpe and Scheirman, and there was some corroboration to support the accusation. On February 21, 1992, a representative of the district attorney's office told the accused that Ward was prepared to testify to the accused's alleged involvement. The accused denied the allegation and continued to represent Sharpe in connection with the conspiracy charges arising out of the August 1991 drug transaction.

Concerned that Ward's allegation might later provide Sharpe and Scheirman with a ground for post-conviction relief, the district attorney moved to postpone their trial, which was set for February 25, 1992. That motion was denied. Thereupon, the indictments were dismissed.

Ward's accusation against the accused was investigated by representatives of the Douglas County District Attorney's Office and the Oregon State Police, beginning on February 24, 1992. The accused authorized the investigators to interview Sharpe, who was still his client. Before the investigators contacted Sharpe, he called them to offer an unrecorded statement.

An investigator interviewed Sharpe, outside the presence of the accused. Sharpe denied that the accused was present at the August 1991 drug transaction but admitted that he had been. Sharpe's admissions gutted the entrapment defense that the accused had raised on Sharpe's behalf.

The investigators concluded that there was not enough evidence to indict the accused and ended their investigation of him on March 18, 1992. Sharpe was reindicted on March 26, 1992, and was convicted in November 1992.

C. *Third Cause of Complaint — Representation of Durbin.*

On November 13, 1992, the accused undertook to represent Durbin. Durbin and Karr (the woman with whom Durbin lived) had been arrested in October 1992 on drug charges. The accused received a copy of the police report soon after beginning the representation. According to the police report, Karr had made several incriminating statements concerning Durbin's drug activities. The accused recognized early in the representation that Durbin's biggest problem was that Karr had implicated him. The accused also knew that Durbin had been convicted on October 28, 1992, of assaulting Karr, an incident that had occurred before the October 1992 arrest on drug charges.

On November 23, 1992, Durbin again was arrested on drug charges. Karr had called the police and told them that they had overlooked a large amount of marijuana that was still hidden in the bushes and that Durbin was going to dig it up. Officers were dispatched to the described location and saw Durbin loading something into his truck. The officers stopped him and found approximately two pounds of marijuana. The police report described Karr's part in precipitating this arrest. The accused did not immediately inform Durbin that Karr was cooperating with the police.

Durbin wanted to assist Karr and asked the accused to help her negotiate a plea agreement with respect to the October 1992 arrest. The accused did so. He approached the district attorney about plea offers for both Durbin and Karr and reported back offers of a 20-month prison term for Durbin and a 60-day jail term for Karr. The accused advised them to accept the offers and suggested that Durbin speak in

court on Karr's behalf, so that she could receive a lighter sentence to avoid separation from her child.

In addition to inquiring on Karr's behalf and passing along the district attorney's plea offer, the accused answered Karr's questions concerning the maximum sentences and fines for the relevant crimes. Karr wrote in a letter to the Bar that she had represented herself and that the accused had told her that he could not represent her because of his representation of Durbin. She also wrote that she "was given only free legal advice from [the accused]."

Durbin later became concerned that the accused was acting in Karr's interest more than in his, and he fired the accused in December 1992.

D. *Fourth Cause of Complaint — Representation of Clark.*

A criminal trial was scheduled for October 6, 1993, in Coos County District Court, before Judge Gillespie. The accused represented the defendant, Clark. On the day of trial, the judge asked whether the parties were ready to proceed. The accused said that the defense was not ready and made several motions, seeking to postpone the trial and to withdraw Clark's waiver of a jury trial. The judge denied the motions. The accused also had asked the judge to recuse himself, on the day before trial, and the judge had declined to do so. The accused believed that the judge would be unfair to Clark if the trial went forward.

The judge and the accused then engaged in the following colloquy:

"[The accused]:    * * * And I'll be honest with you, your honor, I. . .it's going to be hard for me to participate in this kind of a trial when I think that my client's interests are definitely being prejudiced, and I would say that I, if I have to, I won't put on any defense and that'll be ineffective assistance of counsel, and then it'll be appealed on reversal [*sic*].

"Judge:   So what you're going to tell me is that you're prepared to commit an ethical violation in this court for purposes of this defense?

"[The accused]:   I am, your honor.

"Judge:   [Accused,] do you realize that on the record you are putting yourself in the position of advising me in court that in an effort to prejudice the administration of justice you are prepared to, essentially, create reversible error?

"[The accused]: Well, your honor. . .

"Judge: Answer my question, sir.

"[The accused]: I, I'll talk to my client, I haven't talked to my client. I will advise my client of the situation, as she also understands it. . .

"Judge: No, I'm asking about your intentions, sir.

"[The accused]: I have to talk to my client, I'm expressing that in my opinion, that my client is not going to receive a fair trial here, and I have made every effort to apprise the court that this individual has a significant impact on her defense, it is her only defense, and that I did talk to her about the case, and to the best of her knowledge she didn't disclose this guy's name because she didn't think at that point in time that it would do any good because he was not willing to come forward. There is no harm nor prejudice, the state[']s indicated that there is not prejudice to them, I can see no reason why it would in any way impact the state to have this thing setover and have a jury trial and have her have a chance to have a fair trial.

"Judge: She had an opportunity to have a jury trial, and she had that opportunity today, and she chose to waive that. . . [Accused,] I want an answer to my question.

"[The accused]: I'm not going to answer the question your honor. I have to talk to my client first.

"Judge: [Accused,] I'll give you five minutes to talk to your client and if you refuse to answer a question of mine in this court again I will hold you in contempt. You have five minutes, [accused].

"[The accused]: Alright your honor.

"Judge: [Accused,] you indicated a desire to speak to your client.

"[The accused]: Yes your honor. In speaking with you[ ] and obviously the exchange the court and I had, it's clear that it would be difficult, and my presence here would even jeopardize her ability to receive a fair trial. In talking with her the only solution that I can see, and I've told her, is that I would find it more appropriate for me to withdraw at this time, and I would do that your honor.

"Judge: I'll deny your motion. I am now intending to proceed with the trial. Based upon your earlier statement are you intending to refuse to offer a defense in order to intentionally prejudice the interests of your client, or the interests of this trial so that you will create reversible error?

"[The accused]: Your honor, I've talked with my client about that, and I don't feel that any decision has been made.

"Judge: I am asking you, sir. Are you intending to offer a defense?

"[The accused]: I have not got to that point, your honor.

"Judge: Are you intending to participate in the trial?

"[The accused]: Well, I guess the problem I'm having is that . . .

"Judge: The problem you're having is you're not answering my question. Are you intending to participate in the trial?

"[The accused]: I guess I need to actually talk to my client again, since I think that the only equitable solution would be for me to withdraw and allow her to either proceed individually or whatever the court would determine, but I guess my participation at this point is almost moot to me because there's such a divergence here on what the focus is as far as what's in her best interests.

"Judge: Now, [accused,] you earlier stated on the record that because of my rulings, which you disagreed with, which you have the right to disagree with, you were intending to refuse to take further action in order to intentionally create reversible error.

"[The accused]: I've talked to my client about that and she understands that she would be the victim of that and have to serve whatever time would be appropriate, and I indicated to her also that it was clear that depending upon how much more that conversation carried on that it was possible and quite likely that I would be held in contempt and that that would also highly prejudice her ability to proceed to a fair trial. And quite frankly it would seem to me that, really as I indicated, the only equitable solution in her best interests is for me to withdraw.

"Judge: That's been denied.

"[The accused]: Right.

"Judge: Now, my question is, are you intending to pursue your further threat to refuse to participate in the trial to intentionally create reversible error?

"[The accused]: I guess I would have to wait until the state's case is folded your honor, and the time is appropriate for us to assume that the defense of her case, and quite frankly that would be a choice that she would have to make, not a choice that I would make.

"Judge: You previously indicated that you were going to make that choice, and that that was your intention. Are you withdrawing your previous statement?

"[The accused]: No, what I'm saying your honor is that I believe that that is a choice that she will have to make, and in the discussion we had in the hallway we talked about that aspect of it, and I believe that that decision will be her decision, not mine.

"Judge: So if your client advises you that she wants you to intentionally create reversible error by refusing to participate in the trial, are you prepared to do so?

"[The accused]: I guess what I'm suggesting to the court. . .

"Judge: Answer my question, yes or no?

"[The accused]: Your honor, I don't know if I can answer your question the way you've asked it.

"Judge: My question is, if you are directed by your client to intentionally create reversible error [b]y refusing to participate in the trial to generate an issue of ineffectual assistance of counsel for purposes of post-conviction relief, are you prepared to do that?

"[The accused]: I haven't talked to her about that, and I'm not sure if at this time. . .

"Judge: I didn't ask if you had been instructed, I asked based upon your earlier statement, are you prepared to do that?

"[The accused]: I need to talk to her, and I don't know if I'm prepared at this time to state whether I am prepared to that.

"Judge: Is that an option that you have available? Do you consider that an option in your representation of this defendant?

"[The accused]: I don't know if I, I don't know if I actually consider that an option to do it exactly along the lines as the court has addressed it.

"Judge: Is that not exactly what you said you prepared to do earlier?

"[The accused]: You actually increased the scope of that particular question by involving her decision in the process of whether she would want me to do that, and I don't know if I would be prepared to do that, and I haven't discussed it fully. And I don't know at this point in time based upon these

proceedings if it would be a decision that I would make unilaterally, to be quite honest with you.

"Judge: Well [accused,] I'll tell you how it is; you previously stated on the record in this proceeding that because you disagree with my ruling you were prepared to not participate further so that you would intentionally create reversible error on post-conviction relief for inassistance of counsel — is that not a fair characterization of what you said?

"[The accused]: I said I was prepared to do that.

"Judge: Are you intending to do that?

"[The accused]: I have to, I've talked to my client. . .

"Judge: [Accused,] I asked you a question, are you now intending to do that? Answer the question yes or no.

"[The accused]: I don't think I can answer the question directly your honor because it's a decision, again, that I think I would need to discuss quite fully with my client prior to her defense, when the time is called for.

"Judge: Are you willing to participate in the defense along those lines?

"[The accused]: To be honest, I'd have to think about it a little bit more in light of. . .

"Judge: How much time do you need; you've already threatened to do it.

"[The accused]: Right, I guess I'd have to wait until the time comes your honor, it's not to that time yet.

"Judge: [Accused,] I'll remove you from this matter. You are discharged from further representation of this defendant in this case. Leave my court room.

"[The accused]: Yes your honor."

Judge Gillespie postponed Clark's trial and appointed new defense counsel for her.

## DISCUSSION

### A. *First Cause of Complaint.*

When the accused undertook to represent Sharpe and Scheirman, who were accused of being co-conspirators in a drug transaction, there was a likely conflict of interest. Each client had a potential interest in convincing the trier of fact that he was less culpable than the other. Each had a potential interest in obtaining a favorable plea agreement in exchange

for testifying against the other. In those circumstances, a likely conflict of interest existed. *See In re O'Neal*, 297 Or 258, 260-66, 683 P2d 1352 (1984) (lawyer had a potential conflict when representing codefendants in a criminal case, even when he tried to limit the representation to negotiating pleas for them, because of the inevitable comparisons between the codefendants and the potential differences in their situations).

In the face of a likely conflict, the accused failed to give a full disclosure. The document signed by Sharpe and Scheirman fell short in substance, because it did not contain advice to seek independent legal advice, and it fell short in form, because the written consent was not obtained at the time the accused undertook the dual representation. *See* DR 10-101(B) (defining "full disclosure"); *see also In re Altstatt*, 321 Or 324, 330, 897 P2d 1164 (1995) (When the accused was aware that a possible conflict of interest existed at the time the accused undertook to representation of clients, and the accused did not "contemporaneously confirm any of his [oral] disclosures [of that potential conflict] in writing," the accused failed to make a full disclosure, as required by DR 10-101(B).).

The likely conflict ripened into an actual conflict when the district attorney offered to reduce charges in the unrelated case against Scheirman, in exchange for Scheirman's testimony against Sharpe in the case in which they were codefendants. At that time, the accused owed a duty to Scheirman to advise him of the possible benefits of the proposal. Contemporaneously, however, the accused owed an opposing duty to Sharpe, to try to minimize the consequences of the criminal charge pending against him. Such a situation involves an actual conflict of interest. *See In re Porter*, 283 Or 517, 524, 584 P2d 744 (1978) (actual conflict of interest occurred when lawyer undertook to represent 14 criminal codefendants, because they had differing interests that may have required the lawyer "to subvert the interests of one or more of the group, as individual clients, to that of the group").

We conclude that the accused violated DR 5-105(E) as charged in the First Cause of Complaint.

## B.  *Second Cause of Complaint.*

We assume, in our discussion, that the accused was innocent of the charge of having participated in the August 1991 drug transaction with Sharpe and Scheirman. That does not mean, however, that the accusation, which was being investigated actively by law enforcement authorities between February 24 and March 18, 1992, did not affect the accused's representation of Sharpe.

During the period of the investigation of the accused, the accused had a strong personal interest in being exonerated, an interest in his liberty and his good name. Additionally, the accused had a financial interest in avoiding the payment of legal fees to defend a criminal charge and, potentially, to pay a fine or costs.

The exercise of the accused's professional judgment on Sharpe's behalf reasonably may have been affected by those interests of the accused, from the time he learned of Ward's accusation on February 21, 1992. Moreover, the accused's professional judgment was in fact affected when he permitted a special investigator to interview Sharpe without the benefit of counsel, in order to forward his own interests.

The accused allowed the special investigator to question Sharpe outside the presence of his counsel, the accused. *See* DR 7-104(A)(1) (a lawyer or that lawyer's agent may not contact a represented party without consent of the represented party's lawyer). During that interview, Sharpe made incriminating statements that made his previously asserted entrapment defense no longer viable. In this situation, the accused's professional judgment on behalf of Sharpe was clouded.

We conclude that the accused violated DR 5-101(A) as charged in the Second Cause of Complaint.

## C.  *Third Cause of Complaint.*

Karr's interests were reasonably likely to conflict with, and in fact did conflict with, the interests of Durbin, the accused's client, throughout the accused's representation of Durbin. The accused knew of that adversity of interest. For example, he knew that Karr had made statements to police, implicating Durbin in an illegal drug transaction, and he

knew that Durbin had been convicted of assaulting Karr. Karr was not represented by other legal counsel.

What the accused did on Karr's behalf amounted to legal representation, although he steadfastly denies the label. The accused solicited the district attorney's office for a plea offer for Karr, as well as for Durbin. He urged Karr to accept the offer given and relayed her acceptance to the district attorney's office. He answered Karr's questions about maximum sentences and fines for relevant crimes. In short, the accused advised an unrepresented party with interests adverse to those of his client.

We conclude that the accused violated DR 7-104-(A)(2) as charged in the third cause of complaint.

D. *Fourth Cause of Complaint*.

■ In order to prove that a lawyer has violated DR 1-102(A)(4), the Bar must prove that the lawyer either has engaged in repeated conduct causing some harm to the administration of justice or has performed a single act causing substantial harm to the administration of justice. *In re Haws*, 310 Or 741, 748, 801 P2d 818 (1990). "Administration of justice" includes both the procedural functioning of a tribunal and the substantive interests of parties to the proceeding. *Id.* at 747. A lawyer's conduct could violate the rule if it causes prejudice to either of those components of the administration of justice. *Ibid.*

Here, the accused performed a single act causing substantial harm to the administration of justice. On the day set for a criminal trial, the accused threatened to refuse to represent his client responsibly, for the avowed purpose of creating reversible error. Although the accused reduced his absolute threat to a somewhat ambiguous threat, he declined to disavow or withdraw the threat and, indeed, told the trial court that he had advised his client that it was "quite likely" that the accused would be held in contempt for his planned behavior.

The substantial harm caused by the accused's act has two components. The first component is harm to the orderly process of the courts generally. The accused tried to force the

court to rule in his favor by threatening to refuse to cooperate, rather than by using appropriate avenues for relief, such as making a record for appeal. The act of the accused thus deprived the court of the ability to control the case and manage the courtroom. As Judge Gillespie aptly testified:

"[T]he ethical responsibility of a lawyer in terms of accepting the rulings of the Court are [sic] sort of like the glue that holds the system together.

"* * * * *

"* * * I rule against lawyers all the time. I mean, that's part of my job. I rule in favor of some and I rule against many. * * *

"And you're faced with a situation if a lawyer refuses to exercise their judgment and follow your rulings, you can't continue. And the process simply won't work because if a lawyer is able to say at the conclusion of a decision-making process, 'Sorry, Judge, I don't like it. I'm not going to play ball,' the system will simply fall apart * * *."

The second harm in this case was specific to the procedural functioning of the Clark trial. A continuance was required. Additionally, a new lawyer had to be appointed for Clark, and the state had to prepare for trial again. Thus, both time and resources were wasted.

We conclude that the accused violated DR 1-102-(A)(4) as charged in the fourth cause of complaint.

## SANCTION

■■ This court refers to the ABA *Model Standards for Imposing Lawyer Sanctions* (1991) (ABA Standards) for guidance in deciding on an appropriate sanction in a lawyer discipline case. *In re Haws*, 310 Or at 753. We consider the duty violated, the mental state involved, the injury that resulted, and any aggravating or mitigating circumstances.

■ Here, the accused violated duties owed to his clients to avoid conflicts of interest, both as to the interests of other clients and as to his own interests. ABA Standard 4.3. He also violated a duty owed to the legal system by abusing the legal process. ABA Standard 6.2.

The accused acted knowingly in representing clients with conflicting interests. *See* ABA Standards at 7 (defining

"knowledge" as "conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective" to achieve a particular result). He acted intentionally in threatening to create reversible error if a trial judge did not grant his motions. *See* ABA Standards at 7 (defining "intent" as "the conscious objective or purpose to accomplish a particular result").

In this case, actual injuries occurred to clients of the accused. Scheirman lost the opportunity to consider, and perhaps to accept, a plea agreement. Sharpe's interests were harmed when he was permitted to be questioned without counsel, resulting in his making self-incriminating statements. In addition, actual harm resulted in the Clark matter in that the accused's misconduct caused the trial court to postpone Clark's trial and to appoint new counsel, wasting both time and resources.

Before considering aggravating and mitigating factors, the ABA Standards provide that suspension generally is appropriate "when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to the client," ABA Standard 4.32, and when a lawyer "causes interference or potential interference with a legal proceeding," ABA Standard 6.22.

There are several aggravating factors present. The accused was the recipient of prior disciplinary action (two previous letters of admonition[6]), ABA Standard 9.22(a); he engaged in a pattern of misconduct, involving three separate conflicts of interest, *id.* at (c); he violated multiple rules and is guilty of multiple offenses, *id.* at (d); and he had substantial experience in the practice of law, *id.* at (i).

We find no mitigating factors.

---

[6] In 1986, Bar counsel advised the accused that the State Professional Responsibility Board (SPRB) was of the opinion that efforts by the accused to claim funds erroneously deposited into his bank account violated DR 1-102(A)(4). In 1987, Bar counsel advised the accused that the SPRB was of the opinion that a letter written by the accused threatened to press a criminal charge to obtain an advantage in a civil matter, in violation of DR 7-105(A). In neither instance was a formal disciplinary proceeding instituted.

This court has suspended lawyers for five weeks for violations of DR 1-102(A)(4) involving conduct somewhat similar to the accused's in the Clark matter. *See In re Smith*, 316 Or 55, 61-62, 848 P2d 612 (1993) (lawyer threatened to sue an independent medical examiner for an unfavorable opinion in a workers' compensation case, before the examination had occurred); *In re Rochat*, 295 Or 533, 540, 668 P2d 376 (1983) (lawyer harassed court personnel in an attempt to secure court appointments to represent indigent defendants). In this case, however, the conduct of the accused was more fundamentally harmful to the administration of justice than was the conduct of those lawyers. The accused aggressively pursued an inappropriate confrontation with a trial judge, in open court, that resulted in a needless postponement of a criminal trial. This court views such behavior with the utmost seriousness.

This court also has stated that one "violation of the conflicts rule * * * would justify a 30-day suspension." *See In re Hockett*, 303 Or 150, 164, 734 P2d 877 (1987) (lawyer represented two men in the formation and maintenance of a corporation, and simultaneously represented those men's wives in marriage dissolution proceedings). In this case, however, the conflicts of interest were several and egregious, and there also are aggravating factors with respect to those conflicts: the persistent nature of the accused's misconduct, the injuries sustained by his clients, and the presence of self-interest with respect to one violation.

In the circumstances, a substantial period of suspension is called for. We conclude that a nine-month suspension is the appropriate sanction. We note that the trial panel stayed four months of a six-month suspension, if the accused received additional education and passed the professional responsibility portion of the bar examination. The trial panel did not explain, however, how those conditions relate to the accused's specific situation, and we do not believe that such conditions are appropriate in the circumstances.

The accused is suspended from the practice of law for a period of nine months.